ORIGINAL

Approved: _____
EMILY A. JOHNSON
Assistant United States Attorney

Before:     THE HONORABLE ROBERT W. LEHRBURGER
            United States Magistrate Judge
            Southern District of New York

------------------------------------ X
                                      :  **SEALED COMPLAINT**
UNITED STATES OF AMERICA              :
                                      :  Violations of 18 U.S.C.
              - v. -                  :  §§ 1343 and 2
                                      :
DANA MCCANN,                          :  COUNTY OF OFFENSE:
     a/k/a "Dan McCann,"              :  NEW YORK
     a/k/a "Dan McCan,"               :
     a/k/a "Dr. Dan,"                 :
                                      :  **19 MAG 9045**
              Defendant.              :
                                      :
------------------------------------ X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        JAMES FORMICA, being duly sworn, deposes and says that
he is a Special Agent with the Food and Drug Administration Office
of Criminal Investigations, and charges as follows:

**COUNT ONE**
(Wire Fraud)

        1.    From at least in or about April 2016, up to and
including the present, in the Southern District of New York and
elsewhere, DANA MCCANN, a/k/a "Dan McCann," a/k/a "Dan McCan,"
a/k/a "Dr. Dan," the defendant, willfully and knowingly, having
devised and intending to devise a scheme and artifice to defraud,
and for obtaining money and property by means of false and
fraudulent pretenses, representations, and promises, and
attempting to do so, transmitted and caused to be transmitted by
means of wire, radio, and television communication in interstate
and foreign commerce, writings, signs, signals, pictures, and
sounds for the purpose of executing such scheme and artifice, to
wit, MCCANN engaged in a scheme in which he posed as a plastic
surgeon who sought monetary investments from patients and other
individuals in the fat freezing machine he used for medical fat
freezing procedures by promising substantial returns on this

investment that never materialized, and, in furtherance of that scheme, transmitted and caused to be transmitted wire transfers, and attempted to do so.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

2. I am a Special Agent in the Food and Drug Administration Office of Criminal Investigations ("FDA-OCI"), and I have been personally involved in the investigation of this matter. I have been employed by the FDA-OCI since October 2014. I and other members of the investigative team have experience in fraud investigations and techniques associated with such investigations, including executing search warrants and financial analysis.

3. This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my examination of documents and reports prepared by others, my interviews of witnesses, and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of the investigation. Where the contents of documents, including emails, and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where specifically indicated otherwise.

**THE FRAUDULENT SCHEME**

4. As described in detail below, I have learned that from at least in or about April 2016, up to and including the present, DANA MCCANN, a/k/a "Dan McCann," a/k/a "Dan McCan," a/k/a "Dr. Dan," the defendant, engaged in a scheme in which he posed as a plastic surgeon and sought monetary investments from patients and other individuals in the fat freezing machine that he used for medical fat freezing procedures by promising substantial returns on this investment. MCCANN told victims of the fraud scheme, in sum and substance, that MCCANN's company ("Company-1") facilitated investment arrangements among Company-1, an investor, and a doctor or medical spa wishing to enter the fat freezing business. MCCANN would propose to victims, in sum and substance, that the victim purchase a fat freezing machine that MCCANN and/or Company-1 would place in a doctor's office or medical spa, and as the owner of fat freezing machine placed at a particular office or spa, the victim

2

would receive a portion of the monthly profits from the use of the machine at that location, while the victim's monetary investment would remain secured by ownership of the actual fat freezing machine.

    5.    In or around July 2018, victims were contacted by individuals purporting to work for a Chinese company ("Company-2") that claimed, in sum and substance, to have purchased Company-1.  Company-2 told victims, in sum and substance, that Company-2 was offering victims an opportunity for Company-2 to repurchase their fat freezing machines, as Company-2 did not want to continue the same investment arrangement as Company-1.

    6.    Based on my training and experience and participation in this investigation; review of email communications sent and received by DANA MCCANN, a/k/a "Dan McCann," a/k/a "Dan McCan," a/k/a "Dr. Dan," the defendant, and email communications sent and received by Company-2; and business records from email and telecommunications providers, I believe that Company-2 is an alter ego of MCCANN, who perpetuates the fraud scheme by posing as the principals of Company-2.

        a.    Based on my review of subscriber information for the email account in the name of MCCANN ("Email Account-1") that was used to communicate with victims regarding the fraud scheme, I have learned that the recovery email for Email Account-1 is another email account in the name of MCCANN ("Email Account-2").  The subscriber information also includes an associated phone number ("Phone Number-1").

        b.    Based on my review of subscriber information for the email account in the name of Company-2 ("Email Account-3") that was used to communicate with victims regarding the fraud scheme, I have learned that the alternate email address for Email-Account-3 is Email Account-2 and the verified phone number is Phone Number-1.

        c.    Based on my review of subscriber information for Email Account-2, the subscriber's name is "Dana McCann," and the associated phone number is Phone Number-1.

        d.    Based on my review of subscriber information for Phone Number-1, the subscriber name is "Dana M."

    7.    Based on my review of bank account records and my communications with victims, the losses associated with the scheme are at least in or around $400,000.

3

### A. *Background on DANA MCCANN, a/k/a "Dan McCann,"*
### *a/k/a "Dan McCan," a/k/a "Dr. Dan"*

8.    Based on a review of the website of a medical spa ("Spa-1") located in New York, New York where DANA MCCANN, a/k/a "Dan McCann," a/k/a "Dan McCan," a/k/a "Dr. Dan," the defendant, performed medical fat freezing procedures, I have learned the following, in sum and substance, about MCCANN:

a.    Spa-1's website described MCCANN as its "Fat Freezing Medical Director" and featured a picture of MCCANN wearing a white lab coat with "Dr. D" written on the coat.

b.    MCCANN's biography on Spa-1's website described MCCANN as follows:   "Dr. Dan (Dan McCan) has lived in and treated patients in more than two dozen countries.   For the past six years his specialty has been freezing fat.   To date he has done close to 6,000 procedures, which is believed to be 5-6x more than anyone else on earth."

9.    Based on my communications with the manager of Spa-1, I have learned that DANA MCCANN, a/k/a "Dan McCann," a/k/a "Dan McCan," a/k/a "Dr. Dan," the defendant, in sum and substance, claimed to be a licensed plastic surgeon in California, who used to work in Beverly Hills.

10.   Based on my communications with victims of the fraud scheme, I have learned that DANA MCCANN, a/k/a "Dan McCann," a/k/a "Dan McCan," a/k/a "Dr. Dan," the defendant, typically introduced himself to them, in sum and substance, as a plastic surgeon who used to practice in Beverly Hills, California.

11.   Based on my review of medical licensing records from New York and California, there is no record of a licensed physician by the name of DANA MCCANN or DAN MCCANN in either state.

### B. *Victim-1*

12.   Based on my review of documents, including bank records, email communications between Victim-1 and DANA MCCANN, a/k/a "Dan McCann," a/k/a "Dan McCan," a/k/a "Dr. Dan," the defendant, email communications between Victim-1 and Company-2, and my communications with Victim-1, I have learned the following, in sum and substance, about MCCANN's interactions with Victim-1:

a.    In or around April 2017, Victim-1 met MCCANN when Victim-1 visited Spa-1 for fat-freezing services.   MCCANN

4

introduced himself to Victim-1, in sum and substance, as "Dr. Dan McCann," a plastic surgeon, and MCCANN gave Victim-1 a full body examination and performed the fat-freezing procedure. Following the procedure, MCCANN proposed, in sum and substance, that Victim-1 invest in fat freezing machines.

b.    On or about April 10, 2017, MCCANN emailed Victim-1 regarding, in sum and substance, the potential investment in fat freezing machines.

c.    On or about April 11, 2017, MCCANN and Victim-1 entered into an Investment Agreement for the purchase of a fat freezing machine. The Investment Agreement's terms state, in sum and substance, that Victim-1 would pay MCCANN $15,000 for the purchase of Machine-1 to be placed at Spa-1. For usage of the machine, MCCANN would pay Victim-1 monthly the greater of either $1500, or 5% of the total receipts from the fat freezing business of Spa-1. When these payments totalled $30,000, Victim-1 would transfer ownership of the machine; and regardless of when ownership transfer occurred, Victim-1 would receive a payment of "5% for no less than 60 months."

d.    On or about April 11, 2017, Victim-1 paid $15,000 to MCCANN via cashier's check.

e.    On or about May 16, 2017, Victim-1 entered into a second Investment Agreement with MCCANN for the co-purchase of a second fat freezing machine for $7,500 each. The second Investment Agreement's terms state, in sum and substance, that MCCANN would place the second fat freezing with another doctor, who would pay MCCANN and Victim-1 "5% each bi-monthly."

f.    On or about May 16, 2017, Victim-1 paid $7,500 to MCCANN via cashier's check.

g.    On or about November 7, 2017, MCCANN and Victim-1 entered into a Joint Venture Agreement with another doctor for a third fat freezing. The terms of the Joint Venture Agreement state, in sum and substance, that Victim-1 would pay an initial 50% deposit of $3,000 and would begin receiving payments of 10% of the doctor's fat freezing income when the additional $3,000 was remitted.

h.    On or about November 7, 2017, Victim-1 paid $3,000 to MCCANN via check.

5

i.    Between in or around June 2017 and in or around January 2018, Victim-1 received some royalty payments from MCCANN via check, all of which are less than the payments required under the terms of the three contracts.  For example, the first Investment Agreement requires payment of the greater of $1500, or 5% of the total fat freezing business of Location-1, and no payment to Victim-1 during this time period ever exceeded $1500.

j.    On or about January 25, 2018, MCCANN sold Victim-1 a fourth fat freezing machine.  The sale is documented in a written receipt executed by MCCANN that states, in sum and substance, that Victim-1 purchased Machine-1 for $5,000 cash given to MCCANN plus the future royalties due to Victim-1 from February 2018 forward for Victim-1's previously purchased machines.

k.    Between in or around July 2018 and in or around August 2018, an individual purporting to be "Edward Papa" of Company-2 emailed individuals who invested in fat freezing machines, including Victim-1.  Papa's emails stated, in sum and substance, that Company-2 had purchased Company-1 and sought to buy back investors' machines.

l.    On or about August 22, 2018, Victim-1 received a sales contract that had been executed by "Edward Papa" for Company-2 for Victim-1's signature.  The sales contract states, in sum and substance, that Company-2 would pay Victim-1 $80,000 to repurchase the four fat freezing machines that Victim-1 had previously purchased.

m.    On or about October 1, 2018, "Edward Papa" emailed Victim-1 stating, in sum and substance, that Victim-1's $80,000 payment would go out in the next twenty-four hours.

n.    On or about October 2, 2018, "Edward Papa" emailed Victim-1 that, in sum and substance, Victim-1's payment had been placed in the U.S. mail, listing a certified receipt number of "7016 3010 0000 6489 4094."  Based on communications with law enforcement officials at the U.S. Postal Inspection Service, I have learned that the number provided in this email is not connected to any receipt or tracking system within the U.S. Postal Service.

o.    Victim-1 paid MCCANN at least $30,500 for the purchase of four fat freezing machines, and Victim-1 has never received the machines or any payment for their repurchase by Company-2.

6

## C. *Victim-2*

13. Based on my review of documents, including bank records, email communications between Victim-2 and DANA MCCANN, a/k/a "Dan McCann," a/k/a "Dan McCan," a/k/a "Dr. Dan," the defendant, email communications between Victim-2 and Company-2, and my communications with Victim-2, I have learned the following, in sum and substance, about MCCANN's interactions with Victim-2:

a. Victim-2 was introduced to MCCANN by Individual-1, who worked for Company-1, which was purportedly engaged in the business of placing fat freezing machines at doctor's offices and medical spas. Victim-2 was told by MCCANN and Individual-1 that she would receive a portion of the monthly income generated by the fat freezing machine in exchange for purchasing a machine at a price of $15,000 per machine.

b. Between in or around April 30, 2018 and in or around June 11, 2018, Victim-2 paid $100,000 for the purchase of at least six fat freezing machines.

c. On or about June 21, 2018, after Victim-2 had transferred $100,000 for purchase of fat freezing machines, MCCANN emailed Victim-2 stating, in sum and substance, that another $5000 would purchase a machine for which MCCANN already had a buyer, and by next week Victim-2 would "get . . . this investment back, plus at least $5,000 profit" that Victim-2 could continue to reinvest.

d. On or about June 21, 2018, Victim-2 transferred $5000 to MCCANN.

e. On or about July 5, 2018, "Edward Papa" from Company-2 contacted Victim-2 stating, in sum and substance, that Company-2 purchased Company-1 and offering to buy back Victim-2's fat freezing machines for $160,000, payable within 30 days. Victim-2 responded, in sum and substance, that she accepted the offer.

f. Between on or about July 19, 2018 and on or about November 7, 2018, Victim-2 and "Edward Papa" or "Hanzhou Gouw" from Company-2 communicated regarding the payment of $160,000 due to Victim-2 from Company-2.

g. On or about October 2, 2018, "Hanzhou Gouw" from Company-2 emailed Victim-2 stating, in sum and substance, that a payment had been sent to Victim-2 and providing a tracking number. Victim-2 received an envelope originating from Georgia

7

containing a check from Company-2 for $25,000 that was returned by her bank for insufficient funds.

h.   On or about April 14, 2019, Victim-2 texted MCCANN, in sum and substance, that she would report him to the authorities if she did not reiceve the payments due to her.   On or about April 15, 2019, Victim-2 received a $20,000 wire from Company-2.

i.   Victim-2 paid at least $116,000 for the purchase of eight machines, and Victim-2 has never received the machines or any payment for their repurchase by Company-2, aside from the $20,000 received in April 2019.

### D. *Victim-3*

14.   Based on my review of documents, including bank records, email communications between Victim-3 and DANA MCCANN, a/k/a "Dan McCann," a/k/a "Dan McCan," a/k/a "Dr. Dan," the defendant, email communications between Victim-3 and Company-2, and my communications with Victim-3, I have learned the following, in sum and substance, about MCCANN's interactions with Victim-3:

a.   MCCANN told Victim-3, in sum and substance, that he used to be a plastic surgeon in Beverly Hills, California. MCCANN asked Victim-3, in sum and substance, to be responsible for the upkeep of Company-1's fat freezing machines in exchange for 1% of Company-1.

b.   MCCANN offered, in sum and substance, to sell Victim-3 two fat-freezing machines for $10,000, one of which Victim-3 could use as a "loaner" machine while repairing other broken devices.

c.   On or about February 28, 2018, Victim-3 paid $10,000 via check for the purchase of two fat freezing machines.

d.   On or about March 5, 2018, Victim-3 received an email from "Hanzhou Gouw" at Company-2 serving, in sum and substance, as a receipt for the purchase of two fat freezing machines that would purportedly be shipped shortly to Victim-3.

e.   On or about June 18, 2018, MCCANN emailed Victim-3 regarding, in sum and substance, a sale of Company-1 to Company-2, attaching an unexecuted contract between MCCANN and Company-2.   MCCANN's email stated, in sum and substance, that investors, including Victim-3, were entitled to income from the

8

sale of his company, and the attached contract specified the specific payment due to each investor. Victim-3 was listed in the attached contract as due a payment of $14,600 from the proceeds of the sale.

f.      In or around July 2018, "Edward Papa" and "Hanzhou Gouw" from Company-2 emailed Victim-3 stating, in sum and substance, that Company-2 wanted to repurchase machines from Victim-3 for $20,000, and the first payments would be received by Victim-3 between August 1 and August 10, 2018.

g.      Between in or around August 2018 and in or around October 2018, Victim-3 received emails from "Edward Papa" regarding, in sum and substance, the timing for payments for the repurchase of Victim-3's fat freezing machines.   On or about October 1, 2018, "Edward Papa" told Victim-3, in sum and substance, that the payment for his machines would be sent in the next twenty-four hours.

h.      Victim-3 has never received any payment for the repurchase of two machines by Company-2, nor has Victim-3 received the fat-freezing machines.

### E. *Victim-4*

15.      Based on my review of documents, including bank records, email communications between Victim-4 and DANA MCCANN, a/k/a "Dan McCann," a/k/a "Dan McCan," a/k/a "Dr. Dan," the defendant, email communications between Victim-4 and Company-2, and my communications with Victim-4, I have learned the following, in sum and substance, about MCCANN's interactions with Victim-4:

a.      Victim-4 was introduced to MCCANN through friends, and MCCANN told Victim-1, in sum and substance, that he used to work as a plastic surgeon in Beverly Hills, California, as well as with an international medical nonprofit organization. Victim-4 visited MCCANN for fat freezing treatments.

b.      MCCANN proposed, in sum and substance, that Victim-4 invest $15,000 for a fat freezing machine that would be placed in other offices for which Victim-4 would receive 10% royalty payments for the machine's use.

c.      On or about July 8, 2017, Victim-4 paid $30,000 to MCCANN by check for two fat freezing machines.

9

i.    On or about June 18, 2018, MCCANN emailed
Victim-4 regarding, in sum and substance, a sale of Company-1 to
Company-2, attaching an unexecuted contract between MCCANN and
Company-2.   MCCANN's email stated, in sum and substance, that
investors, including Victim-4, were entitled to income from the
sale of his company, and the attached contract specified the
specific payment due to each investor.   Victim-3 was listed in the
attached contract as due a payment of at least $36,500 from the
proceeds of the sale.

d.    On or about July 5, 2018, "Edward Papa" and
"Hanzhou Gouw" from Company-2 told Victim-4, in sum and substance,
that Company-2 had purchased Company-1 and offered to repurchase
Victim-4's two fat freezing machines for $40,000.

e.    Between in or around August 2018 and in or
around October 2018, Victim-4 received emails from "Edward Papa"
regarding, in sum and substance, the timing for payments for the
repurchase of Victim-4's fat freezing machines.   On or about
October 1, 2018, "Edward Papa" told Victim-4, in sum and substance,
that the payment for his machines would be sent in the next twenty-
four hours.

f.    Victim-4 has never received the fat freezing
machines or any royalty payments.

### F. *Scope of the Fraudulent Scheme*

16.    Based on my knowledge and experience derived from
this investigation, my review of bank records and emails from
MCCANN and Company-2, and my conversations with victims of the
fraud scheme, I have learned, in substance and in part, that DANA
MCCANN, a/k/a "Dan McCann," a/k/a "Dan McCan," a/k/a "Dr. Dan,"
the defendant, appears to have engaged in the above fraudulent
scheme using the same means and methods described above with
respect to approximately 20 victims totaling at least in or around
$400,000.

17.    As described above, based on my knowledge and
experience derived from this investigation, my review of bank
records and emails from MCCANN and Company-2, and my conversations
with victims of the fraud scheme, I have learned that in
furtherance of the scheme to defraud described above, DANA MCCANN,
a/k/a "Dan McCann," a/k/a "Dan McCan," a/k/a "Dr. Dan,"    the
defendant, transmitted and caused to be transmitted numerous wire
communications in interstate commerce for the purpose of executing
such scheme and artifice, including but not limited to wire

transfers to and from a bank headquartered in New York to and from banks located in other states.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of DANA MCCANN, a/k/a "Dan McCann," a/k/a "Dan McCan," a/k/a "Dr. Dan," the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

JAMES FORMICA
Special Agent
Food and Drug Administration
Office of Criminal Investigations

Sworn to before me this
th day of September, 2019

THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK